Leslie Junior ROARK II, Respondent,

v.

Patricia Ann Mary HARVEY, Appellant.

No. 27927.

Missouri Court of Appeals,
Kansas City District.

Nov. 29, 1976.

Daniel M. Czamanske, Parkville, for appellant.

Benny J. Harding, Kansas City, for respondent.

Before TURNAGE, P. J., and WELBORN and HIGGINS, Special Judges.

ROBERT R. WELBORN, Special Judge.

Following divorce, granting father reasonable visitation privileges with minor son whose custody was awarded to mother, father sought to modify decree to grant specific visitation privileges. Mother filed cross-motion, seeking to further limit father's visitation and seeking increase in support for child from $20 to $40 per week. After a hearing, trial court granted father's motion and denied mother's. She appeals.

Leslie Junior Roark II ("Jay") and Patricia Ann Mary Roark ("Pat") were divorced by decree entered in the Platte County Circuit Court, February 10, 1972. Custody of the couple's three-year-old son, Leslie Junior Roark II ("Les"), was awarded to Pat. On February 7, 1972, the parties had entered into an agreement by which they agreed to recommend to the court that custody of the child be given to the mother and that the husband pay $20 per week for his support. The agreement further provided:

"It is agreed that Husband shall have reasonable visitation rights which will consist of him picking up the child at the home of the Wife at 9:30 A.M. on Saturdays and shall have custody of said child until 6:30 P.M. Sundays which will be every other weekend; Husband shall have visitation with the child every other holiday which holidays shall consist of Thanksgiving, Christmas, New Year's Day, Easter, 4th of July, Labor Day, and the child's birthday, that is to say that if wife has child commencing with Thanksgiving Day of 1972, Husband shall have the child of (sic) Thanksgiving Day of 1973, and that if Wife has child on Christmas of 1972 Husband shall have the child on Christmas of 1973, and the same shall apply to New Year's Day, Easter, 4th of July, Labor Day and the child's birthday. It is further agreed that the Husband shall have the care, custody and control of the minor child for two weeks during the summer and said time for vacation shall be discussed by and between the Parties at least one month prior to vacation time."

The decree of divorce did not incorporate the agreement and provided only for reasonable visitation by the father.

Visitation by Jay proceeded generally in accordance with the agreement until August, 1974, when Pat, for reasons discussed below, decided that the prior visitation arrangement was no longer reasonable and sought to limit the child's visits with his father to five hours once every three weeks. The father's motion to modify was filed September 12, 1974.

At the hearing on the motion in February, 1975, Jay testified that he was a switchman for the Missouri Pacific Railroad. He was earning $44 per day compared with $36 per day at the time of the divorce but had been on the extra board and worked less frequently. In February, 1973, he had remarried. His present wife, Linda, had a five-year-old daughter (Marla

Sue Hopple) by a previous marriage. The child got along well with Les, some 6½ years old at the time of the hearing. Linda and Les also got along well. Jay testified that he loved his son and wanted to see him at every opportunity.

Pat's decision that the visitation arrangement was no longer reasonable was reached in August, 1974, after Les returned following the two-week vacation visit with Jay. Jay worked much of the time during the period and Les spent considerable time with Jay's mother. According to Pat, when Les returned he had bruises on his back, buttocks and legs and scratches on his arms and hands. The child said a cat had scratched him and he said he hadn't fallen. Pat asked Jay about the boy's condition and he said he didn't notice anything. When Les went on his next regular visitation, he again returned with scratches. Pat decided that Les wasn't being watched properly and she "stopped reasonable visitation." Jay attributed the scratches to a cat which slept with them. He said he saw no bruises. Mrs. Roark, Jay's mother, said she never struck Les.

Shortly after the divorce, it was discovered that Les was anemic and he was placed on medication. According to Pat, when he would visit Jay, she would send his medication along, but often when Les and the medication returned home there was no evidence that any medication had been used. Jay said that whenever he brought medication, it was given as called for.

According to Pat and her witnesses, Les would return from visitation with Jay hungry, tired, nervous, inattentive and stuttering. Attempts by Jay to see the boy at school made him upset and nervous. According to Pat, when the visitation became limited, Les became "more at ease."

As evidence that Jay's conduct created an unsuitable moral environment for the child, appellant relied upon a series of occurrences. There was general agreement that the events cited did occur but the evidence was in dispute as to who was at fault and who was present at the time. A summary of the occurrences follows.

Sometime before the divorce Jay went to Pat's mother's house where Les was. Jay had a tape recorder and he attempted to induce Les to say that he wanted to go with Jay. Jay admitted the visit, but said he just wanted to record his son's voice.

Again, shortly before the divorce, Pat and Les were in an auto, Pat noticed Jay following in his auto. She tried to elude him but could not do so and drove to a police station. Jay came up to her car, grabbed Les and said he was going to take him. Pat protested and a policeman interceded. Jay acknowledged the incident and that he took Les from the seat of Pat's car but denied there was a "physical argument."

At around the time of the divorce, Pat, her father and her uncle came to the Roark residence to get Pat's and the boy's belongings. An argument with Jay developed and Jay discharged a shotgun in the air. According to Pat she told Jay she wanted to go in the house and get some of her belongings. Jay told her that all of her things were on the front porch and she wasn't going into the house. When Pat and her uncle insisted, Jay fired the gun. According to Jay, he fired the gun when Pat's father insisted he was going into the house after Jay told him he didn't want him in the house. The police were called in connection with this incident.

Pat testified to Jay's coming to her place of employment at a grocery store and threatening her. Jay said he went to the store in order to talk to Pat about a reconciliation.

According to Bud Harvey whom Pat married in February, 1973, Jay accompanied by Les came to the store where Bud worked in the summer of 1972 and Jay threatened him. Jay said that he was in the store buying groceries and Les wanted to say hello to Bud and no threats were made.

Jay acknowledged that, in the summer of 1972, he went to Bud's apartment. Bud was not there but his roommate was and Jay asked him whether or not Pat spent the weekend there with Bud. Les was along

but according to Jay was out in the hall at the time of the conversation.

Again in the summer of 1972, a problem arose when Jay arrived on a motorcycle to take Les on the visitation.

On Christmas Day, 1972, a difference arose about the time for Jay to return Les to his mother. According to Jay, he took Les to Pat's and when she wasn't there went to Pat's mother's and didn't find anyone. He then went to Pat's uncle Gus Dobbelaire. According to Jay, Gus invited him in and he asked Gus to get hold of Pat and tell her that if she was not home shortly, he would take Les home and return him the next morning. According to Jay an argument developed and Gus hit him and kneed him and threw him out the door. According to Gus, Jay just walked into the house. An argument developed and Gus got mad, "took a swing at him and throwed him out the door."

According to Pat's mother, in March (sic) 1973, Linda was driving an ice cream truck and she and Jay would come past her house, stop and ring the truck bell five or ten minutes, trying to lure Les outside. She also testified to harassing calls and visits from Jay and his mother.

In the summer of 1974, Jay and Linda separated for about 60 days. According to Jay, the separation was the result of the problem about Les's visits. During the separation, Jay, with Les along, took a woman to a drive-in movie. According to Jay, the woman was an old friend and the movie was all there was to it, but he could not recall her name. There was also testimony regarding an encounter between Jay and Linda's ex-husband at which Jay displayed a pistol. Jay said the pistol was unloaded. He was uncertain as to whether Les was present. There was also evidence that, during the separation, Jay and Linda became involved in a situation which resulted in cross-complaints by them charging the other with peace disturbance. There was also a charge that Jay took Linda's money on this occasion.

In August and September, 1974, Les was going to a parochial school in Liberty. Jay came to the school several times to see him. The visits made Les upset and nervous.

On the necessity for increased support, Pat testified that Les's health problem arose after the divorce and required medical expenditures of $14 to $18 every six to eight weeks. She also testified that the cost of the parochial school education was $70 per year plus $20 per month bus fare. Pat testified that she worked as a checker at a supermarket. She was earning $175 per week at the time of the divorce and $128 to $130 per week at the time of the hearing. Pat was 26 years old at that time.

At the conclusion of the hearing the court sustained the motion to modify as to visitation. He granted Jay the right to have the child between 6:00 P.M. Friday and 6:00 P.M. Sunday on alternate weekends, on alternate holidays and for two weeks each summer. On this issue the trial court stated:

"As to the visitation, there are some matters which the parties need to consider in this regard. First, is to the child's nervousness, sullenness, stuttering, not speaking, all of the other matters that came out concerning his actions following visitation. I think after hearing this evidence today and observing both of the parties, that both parties can feel directly responsible for this condition in their child. It appears to the court you have both, especially you Mrs. Harvey, lost sight of the fact that this child is entitled to know its father and be with its father. Your comment that you wanted to live as a family with your son demonstrates that. You have lost sight of the fact that your former husband is a part of your son's family; that your son now has two families and your family is only one of them. You will never be able to live with your son as a complete family to the exclusion of his father, any more than the father will be able to have his son to the exclusion of you as his mother. This child has two families now. It is necessary that the child have a good relationship with both families and it is the duty of the court to see that relationship does exist.

"Many times I think it has been proven that a child is upset at going with a father for visitation and in returning because of anxiety concerning the attitude of his mother toward his visitation and toward his father. It is clear from the evidence I have heard here that that feeling is reflected in your son's attitude and that you are not helping your son by continuing that attitude."

On this appeal, appellant contends that the trial court's visitation decree is not supported by substantial credible evidence, asserting that there is substantial evidence that respondent made misstatements of truth on substantial matters, that respondent has engaged in a persistent pattern of neglect of the child's welfare during visitation and that he has engaged in a course of conduct that creates an unsuitable moral environment for the child.

■ Upon this review, " * * * the decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong." *Murphy v. Carron*, 536 S.W.2d 30, 32[1–3] (Mo. banc 1976).

■ In this case the initial proposition is that respondent as the parent not having custody of the child is entitled to visitation rights unless it is shown that visitation would endanger the child's physical health or impair his emotional development. His visitational rights may be restricted only upon such a showing. § 452.400, RSMo 1975 Supp. Given the nature of respondent's right, the appellant here has not demonstrated that the trial court's conclusion was not supported by the evidence or that it was against the weight of the evidence.

■ The fact that there is evidence in the record which might have supported a different conclusion does not demonstrate that the decree is contrary to the weight of the evidence. The trial court had the opportunity to see and hear the parties. The court was not impressed by appellant's evidence of Les's physical condition upon his return from visitation. His conclusion that complaints of emotional upsets might well have been attributable to stress attendant upon the differences between the parents is not to be ignored. The isolated instances of claimed misconduct did not compel the conclusion that further visitation would impair the child's emotional development. Some of the instances had occurred prior to the divorce. In spite of this appellant was at that time agreeable to the visitation arrangements incorporated in the modification of the decree. The trial court considered the incident evidence of immaturity and not such flagrant and vulgar behavior as would call for restriction of visitation rights. Review of this record does not produce the firm belief that the trial court's conclusions on these matters were wrong.

Appellant argues that respondent's lack of veracity appeared at the hearing and that for this reason his testimony should have been liberally discounted. Appellant says that at his deposition four months before the trial, respondent said he did not recall the incident involving Linda's ex-husband, at which respondent displayed a weapon. Shortly before the trial, he amended his answer to say that he recalled the incident, but that Les wasn't present. At the trial, he recalled the incident but did not recall whether or not Les was present. Appellant points further to respondent's testimony that the woman who accompanied him to the drive-in movie with Les along was an "old friend," but that he was unable to recall her name.

■ These matters were for consideration by the trial court as bearing upon respondent's credibility, but, neither standing alone nor considered with the other evidence, did they call for denial of respondent's motion to modify. The case of *McC.*

*v. McC.,* 501 S.W.2d 539 (Mo.App.1973), cited by appellant, involved a charge of perjury in a custody proceeding. In that case, the court considered the matter as it related to credibility of the custodial parent but in no manner indicated that the matter was of major significance on the right to custody.

Cases such as this involve essentially factual considerations and citations of authority are generally not helpful. There is no necessity to distinguish each of the cases relied upon by appellant. It is sufficient to say that she has cited no case involving restriction of rights of visitation.

■ There has been no demonstration here that the order appealed from was not made by the court below in the best interest of the child and it should, therefore, not be disturbed. *Asbell v. Asbell,* 430 S.W.2d 436 (Mo.App.1968).

■ Appellant complains of error in the trial court's limiting her cross-examination of respondent concerning the change in his deposition testimony and his inconsistent trial testimony regarding the confrontation with Linda's former husband. She also complains that the trial court refused to permit cross-examination of respondent about whether or not he was arrested in connection with some of the incidents relied upon to evidence respondent's lack of fitness to associate with his child.

In neither case was there any offer of proof. On the inquiry concerning the deposition answer, the court's refusal to permit further cross-examination was based upon his conclusion that there was no conflict which would be impeaching. The deposition has not been filed here and there is no basis for this court's concluding that the ruling was erroneous.

■ On the arrests, the trial court informed counsel that he was concerned with the circumstances of the situation, not whether it resulted in an arrest. In view of the inconclusiveness of evidence of arrest, this ruling was not error.

■ Appellant contends that the trial court erred in concluding that there was no evidence of change in circumstances which warranted an increase in the support payment. Appellant points to her evidence of the cost of education and medical care for the child which arose after the divorce and were not considered in the amount awarded at that time.

The trial court's ruling was based upon the absence of evidence of respondent's ability to pay an increased allowance. There was evidence that his daily pay was higher than at the time of the divorce, but, as the court pointed out, there was evidence that he was working fewer days. Under this state of the record, the trial court cannot be said to have abused its discretion. *Papenberg v. Papenberg,* 289 S.W.2d 468, 470[3] (Mo.App.1956).

Judgment affirmed.

All concur.